**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **WALTER LYN LUTON** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No. 23-CV-50-GLJ** |
| | ) |
| **MARTIN O'MALLEY,**[1] | ) |
| **Commissioner of the Social** | ) |
| **Security Administration** | ) |
| **Defendant.** | ) |

**OPINION AND ORDER**

Claimant, Walter Lyn Luton, requests judicial review of a denial of benefits by the

Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). He

appeals the Commissioner's decision and asserts that the Administrative Law Judge

("ALJ") erred in determining he was not disabled. For the reasons discussed below, the

Commissioner's decision is hereby AFFIRMED.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security

Act "only if his physical or mental impairment or impairments are of such severity that he

is not only unable to do his previous work but cannot, considering his age, education, and

---

[1] On December 20, 2023, Martin J. O'Malley became the Commissioner of Social Security.  In
accordance with Fed. R. Civ. P. 25(d), Mr. O'Malley is substituted for Kilolo Kijakazi as the
Defendant in this action.

work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether the correct legal standards were applied. *See Hawkins v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). Instead, the Court must review the record as a whole, and "[t]he

---

[2] Step one requires the claimant to establish that he is not engaged in substantial gainful activity. Step two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairments *is not* medically severe, disability benefits are denied. If he *does* have a medically sever impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity ("RFC") to return to her past relevant work. At step five, the burden shifts to the Commissioner to show that there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, U.S. 474, 488 (1951). S*ee also Casias*, 933 F.2d at 800-01.

## Claimant's Background

Claimant was 53 years old at the time of the most recent administrative hearing. (Tr. 425). He completed tenth grade and has worked as a construction worker and automobile service station mechanic. (Tr. 33, 51). Claimant alleges an amended onset date of November 26, 2014, due to limitations imposed by depression, anxiety, degenerative disc disease, neck problems, and back problems. (Tr. 174-75, 401).

## Procedural History

On November 13, 2014, Claimant applied for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. (Tr. 157-59). His application was denied. ALJ Anne H. Pate held an administrative hearing and determined Claimant was not disabled in a written opinion dated April 12, 2017. (Tr. 12-20). This Court reversed and remanded the case for further proceedings on September 12, 2019. (Tr. 453-62). Subsequently, ALJ Thomas J. Wheeler held a second administrative hearing and determined Claimant was not disabled in a written opinion dated February 3, 2021. (Tr. 495-505). The Appeals Council remanded the case for further proceedings. (Tr. 513-19). As such, ALJ Thomas J. Wheeler held a third administrative hearing and determined that Claimant was not disabled in a written opinion dated March 29, 2022. (Tr. 520-43). The Appeals Council denied review making the ALJ's March 29, 2022, opinion the Commissioner's final decision for the purpose of this appeal. *See* 20 C.F.R. § 404.981.

**Decision of the Administrative Law Judge**

The ALJ made his decision at step five of the sequential evaluation. (Tr. 535). At step two he determined that Claimant had the severe impairments of osteoarthritis of the cervical and lumbar spine, chronic pain syndrome, obesity, depression, and anxiety disorder. (Tr. 526). He found at step three that Claimant did not meet any Listing. (Tr. 527). At step four he found that Claimant had the residual functional capacity ("RFC") to perform a limited range of light work, *i.e.,* he could lift and carry twenty pounds occasionally and ten pounds frequently, sit/stand/walk six hours in an eight-hour workday, and push/pull with no limit except for the previously mentioned lift/carry restrictions. Additionally, the ALJ found he could only occasionally reach overhead with the left upper extremity; frequently reach in other directions, handle, and finger with the left upper extremity; occasionally stoop; and that he could not climb ladders, ropes, or scaffolds. (Tr. 528). The ALJ further noted that Claimant should avoid cold and heat extremes, wet and humid environments, as well as fumes, odors, and dust in concentrations above that normally found in an office environment. (Tr. 529). Due to psychologically-based limitations, the ALJ found Claimant could understand and carry out simple instructions, make simple work-related decisions, maintain attention and concentration to perform simple repetitive tasks, work in proximity, but not collaboratively, with co-workers, and tolerate a low level of work pressure so long as it does not require multitasking, significant independent judgment, or contact with the public. (Tr. 528-29). The ALJ then concluded that although Claimant could not return to his past relevant work, he was nevertheless not

disabled because there was work he could perform in the national economy, *i.e.*, photo copy machine operator, laundry classifier, and garment sorter. (Tr. 534-35).

### Review

Claimant contends that the ALJ erred by: (1) failing to properly analyze his literacy and educational level; (2) relying on vocational expert ("VE") testimony at step five that was inconsistent with the Dictionary of Occupational Titles ("DOT"); (3) failing to inquire about a possible conflict between the DOT and the VE's testimony; and (4) failing to conduct a proper pain analysis that accounted for claimant's headaches and cervical disk disease. The Court finds Claimant's contentions unpersuasive.

The ALJ found Claimant had the severe impairments of osteoarthritis of the cervical and lumbar spine, chronic pain syndrome, obesity, depression, and anxiety disorder. (Tr. 526). The medical evidence relevant to this appeal reveals that Claimant underwent an MRI of his lumbar spine on October 26, 2012, which was unremarkable. (Tr. 355). Physician assistant Tommie Stanberry treated Claimant for low back pain from November 2012 through April 2013 and for shoulder pain in February 2013. (Tr. 319-23).

Thereafter, Claimant established care with Dr. Paul Reel in November 2013 and reported migraine headaches that would occur once every two weeks, in addition to low back pain. (Tr. 317-19). Upon a physical examination, Dr. Reel found that claimant had a decreased range of motion in his lumbar spine. (Tr. 318).  Dr. Reel assessed Claimant with lumbago, migraine headache, and muscle spasm. (Tr. 318-19). In December 2013, at a follow-up appointment, Claimant indicated that the prescribed muscle relaxant gave him a severe migraine. (Tr. 316). Dr. Reel treated Claimant's pain with anti-inflammatory

medication through October 2016 and added a narcotic pain medication in April 2016. (Tr. 310-16, 367-90). He also recommended strengthening exercises for Claimant's neck and back muscles as well as weight loss. (Tr. 373, 379, 390). Dr. Reel's physical examinations of Claimant's neck, back, and musculoskeletal system were largely normal except for a notation in September 2015 that Claimant's cervical spine showed abnormalities of pain and discomfort (Tr. 374, 379, 381, 383, 385, 389). Claimant regularly denied experiencing headaches to Dr. Reel until October 2016 (Tr. 367, 374, 378, 380, 382, 384).

Dr. S.A. Chaudry completed a consultative physical examination of Claimant on November 7, 2016 (Tr. 358-64). He found full range of motion with pain in Claimant's cervical spine and the lumbosacral spine and tenderness in his bilateral trapezius muscles and bilateral paraspinous muscles. (Tr. 359-61, 364). Dr. S.A. Chaudry's impression included osteoarthritis of the cervical and lumbosacral spine. (Tr. 360).

On June 14th, 2018, claimant walked in to the AllianceHealth Durant Emergency Department and reported high blood pressure, light headedness, and left shoulder pain that had been ongoing for three days. (Tr. 804, 807). Claimant was diagnosed with hypertension and discharged from the emergency department with instructions to limit salt intake, avoid ibuprofen, and follow up with his primary care provider for further diagnostic work. (Tr. 812, 823). Upon following up with his primary care physician, claimant was instructed to schedule follow-up visits once a month. (Tr. 865-66). Beginning in June 2018 to December 2021, claimant attended monthly follow-up appointments, generally with Dr. Reel, for hypertension, neck pain, and back pain. (Tr. 840-1025). Additionally, Claimant only reported a headache on October 10, 2019, during this time period and in July 2020

coinciding with increased blood pressure which improved when Claimant took his blood pressure medication. (Tr. 840-1029, 880-881, 929).

As to Claimant's education and literacy, the record indicates Claimant completed the 10th grade without the use of special education services (Tr. 32-33, 175). However, Claimant generally received D's and F's in kindergarten through ninth grade (no grades available for tenth grade), with the exception of C's and B's in third and fourth grade as to his ability to write. (Tr. 249-51). In 8th grade, Claimant was assessed with a 5th grade instructional reading level. (Tr. 250-52). Additionally, Claimant's mother completed two Third Party Function Reports stating Claimant was "illiterate in reading, writing and understanding." (Tr. 193, 263). Notably, Claimant completed two Function Reports, one with the assistance of his mother and one by himself. In the one completed with the assistance of his mother, Claimant claims he has difficulty spelling and understanding what he reads and is illiterate in spelling and reading. (Tr. 205, 255).

On January 13, 2015, state agency physicians initially and upon review concluded that Claimant could perform light work with occasional stooping and either occasional or never climbing ladders, ropes, or scaffolds. (Tr. 60-62, 74-75).[3] Additionally, state agency psychological consultant, Dr. Bernard Pearce, completed a Mental RFC Assessment and found Claimant markedly limited in his ability to: (1) understand and remember detailed

---

[3] The state agency physicians indicated that Claimant could occasionally climb ladders, ropes, and scaffolds, but when explaining their postural limitations and how and why the evidence supported their conclusions, the agency physicians also stated, "The [claimant] can be expected to stoop occasionally and can never be expected to climb ladders, ropes, and scaffolds in an 8 [hour] work period." (Tr. 61, 74-75).

instructions; (2) carry out detailed instructions; and (3) interact appropriately with the general public. (Tr. 62-64). On review, state agency psychological consultant, Dr. Jason Gunter, also found claimant markedly limited in these areas. (Tr. 76-78). However, Dr. Gunter also found claimant was moderately limited in his ability to respond appropriately to changes in the work setting; whereas Dr. Pearce found claimant had no adaptation limitations. (Tr. 64, 77). Dr. Gunter's assessment also noted that a third party indicated Claimant is "illiterate in spelling and reading" (Tr. 73), and that he answered "none" to the question: for how long can you pay attention. (Tr. 72). Ultimately, Dr. Pearce concluded Claimant could not relate to the general public, but that he could perform simple tasks with routine supervision, relate to supervisors and peers on a superficial work basis, and adapt to a work situation. Dr. (Tr. 64). Dr. Gunter assigned a slightly more restrictive mental RFC, concluding Claimant could not relate to the general public, but that he could perform simple tasks with routine supervision, relate to supervisors and peers on a superficial work basis, and adapt to a work setting and some forewarned changes in a usually stable work setting. (Tr. 78).

At the initial administrative hearing, Claimant testified he was unable to work due to pain in his neck and lower back. (Tr. 35). Claimant further testified that he could carry approximately seven or eight pounds, sit for an hour and forty-five minutes, stand for thirty minutes, walk for forty-five minutes, and reach something on a top shelf, but could not reach out in front or move his neck left, right, up or down when he was in pain. (Tr. 41-43). Regarding his education, Claimant testified that he attended school through the tenth grade (Tr. 33). He further testified that he is unable to go to the grocery store or the doctor

without the assistance of his mother; however, he is able to maintain the area in which he lives and mow the yard without assistance. (Tr. 44-46).

At the second administrative hearing in 2021, Claimant again testified that he was unable to work due to pain in his neck and lower back. (Tr. 405). As to his migraines, he testified that he gets migraines once a month and they last for about three days. (Tr. 407). Claimant again testified that he completed the tenth grade, and that he could "read a little," and write short sentences even though some of the words may be misspelled. (Tr. 403). He testified that he is able to read "hot rod magazine." And, when asked how long he could read these magazines for, he stated, "it depends on the subject, just I have to have somebody to what's the name on there." (Tr. 403).

At the third administrative hearing claimant testified that he had headaches at least once a month and that the headaches have contributed to his inability to work. (Tr. 426, 434). He indicated that his headaches usually last two days and that he must lay down in a quiet and dark area until the headache subsides. (Tr. 426-27, 434). Claimant further testified that, to his knowledge, his doctors did not know what caused his headaches and have not prescribed him medication for his headaches, but usually the pain and stiffness in his neck triggers his headaches. (Tr. 427).

At the most recent hearing, the ALJ also elicited testimony from a VE to determine what jobs a claimant could perform given the RFC described above. (Tr. 443). The VE testified that such a claimant could perform the jobs of photocopy machine operator, laundry classifier, and garment sorter, all with an SVP of 2. (Tr. 443). The ALJ then offered a modified hypothetical with a sedentary level of exertion. (Tr. 443). The VE testified that

such a person would be able to perform the jobs of optical goods worker, dowel inspector, and a bench hand. (Tr. 443-44). Lastly, the ALJ offered a modified hypothetical in which Claimant would be absent from his job for three days per month, which the VE testified was not compatible with employment. (Tr. 444).

In his written opinion at step four, the ALJ summarized Claimant's hearing testimony and the medical record. (Tr. 529-534). He gave only some weight to the state agency physicians' medical opinions because evidence and treatment received after the physician's assessment revealed Claimant to be more limited than initially determined by the state agency physicians. (Tr. 533). The ALJ did not indicate what weight he provided to the state agency psychologist's opinions, but his RFC mirrors that of the state agency psychologist's findings. (Tr. 529, 533). Additionally, the ALJ concluded that Claimant had a limited education, and that his headaches were secondary headaches and could not be expected to produce the symptoms to the degree alleged. (Tr. 534, 533).

## I.    RFC Determination

Claimant argues that the ALJ committed reversible error by failing to conduct a proper pain analysis with respect to his headaches and cervical disk disease. (Docket No. 11 at p. 12). The Commissioner uses a two-step process to evaluate a claimant's subjective statements of pain or other symptoms:

> First, we must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second . . . we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . .

Soc. Sec. Rul. 16-3p, 2017 WL 5180304, at *3 (October 25, 2017).[4] *See also Musgrave v. Sullivan*, 966 F.2d 1371, 1375 (10th Cir. 1992) (The ALJ must "consider (1) whether a Claimant established a pain-producing impairment by objective evidence; (2) if so, whether there is a 'loose nexus' between the proven impairment and Claimant's subjective allegations of pain; and (3) if so, whether considering all the evidence, both objective and subjective, claimant's pain is in fact disabling."). Tenth Circuit precedent is in accord with the Commissioner's regulations but characterizes the evaluation as a three-part test. *See e. g., Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1166-67 (10th Cir. 2012), citing *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987).[5] As part of the symptom analysis, the ALJ should consider the factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), including: (i) daily activities; (ii) the location, duration, frequency, and intensity of pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken; (v) treatment for pain relief aside from medication; (vi) any other measures Claimant uses or has used to relieve pain or other symptoms; and (vii) any other factors concerning functional limitations. *See* Soc. Sec. Rul. 16-3p, 2017 WL 5180304, at *7-8. An ALJ's

---

[4]   SSR 16-3p is applicable for decisions on or after March 28, 2016, and superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996). *See* SSR 16-3p, 2017 WL 5180304, at *1. SSR 16-3p eliminated the use of the term "credibility" to clarify that subjective symptom evaluation is not an examination of [a claimant's] character." *Id.* at *2.

[5]   Analyses under SSR 16-3p and *Luna* are substantially similar and require the ALJ to consider the degree to which a claimant's subjective symptoms are consistent with the evidence. *See, e. g., Paulek v. Colvin*, 662 Fed. Appx. 588, 593-594 (10th Cir. 2016) (finding SSR 16-3p "comports" with *Luna*) and *Brownrigg v. Berryhill,* 688 Fed. Appx. 542, 545-546 (10th Cir. 2017) (finding the factors to consider in evaluating intensity, persistence, and limiting effects of a claimant's symptoms in 16-3p are similar to those set forth in *Luna*). This Court agrees that Tenth Circuit credibility analysis decisions remain precedential in symptom analyses pursuant to SSR 16-3p.

symptom evaluation is entitled to deference unless the Court finds that the ALJ misread the medical evidence as a whole. *See Casias*, 933 F.2d at 801. An ALJ's findings regarding a claimant's symptoms "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) [quotation omitted]. The ALJ is not required to perform a "formalistic factor-by-factor recitation of the evidence[,]" *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000), but simply "recit[ing] the factors" is insufficient. *See* Soc. Sec. Rul. 16–3p, 2017 WL 5180304 at *10.

"When determining the credibility of pain testimony the ALJ should consider: 'the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between Claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.'" *Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993). An ALJ is not required to conduct a "formalistic factor-by-factor recitation of evidence[,] so long as the ALJ sets forth the specific evidence" upon which he or she relied. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). The ALJ's findings regarding a claimant's symptoms "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). Here, although the ALJ did not explicitly state the elements, he cited Soc. Sec. Rul. 16-3p, he discussed the objective evidence, determined whether there was a connection between claimant's

allegations of pain, and ultimately concluded based on the objective and subjective evidence that claimant's pain was not as disabling as claimant's subjective statements indicated. (Tr. 530-33).

"SSR 19-4p sets out the criteria for determining whether headaches are a primary disorder that constitutes a medically determinable impairment ("MDI"), or whether the headaches are secondary to a separate MDI." *Melissa H. v.* Kijakazi, 2022 WL 4381158, at * 2 (D. Utah Sept. 22, 2022). SSR 19-4p provides in pertinent part:

> We establish a primary headache disorder as an MDI by considering objective medical evidence (signs, laboratory findings, or both) from an [acceptable medical source]. We may establish only a primary headache disorder as an MDI. We will not establish secondary headaches . . . as MDIs because secondary headaches are symptoms of another underling condition. We evaluated the underling medical condition as the MDI.

SSR 19-4p, 2019 WL 4169635, at *5 (Aug. 26, 2019). The ALJ determined that claimant's headaches were secondary headaches and, not a medically determinable impairment, as none of the medical evidence indicated that claimant's treating physicians had ruled out other possible causes, and there was evidence in the record indicating that claimant's headaches may be connected to either hypertension or claimant's neck pain/cervical disease. (Tr. 530, 532). However, a classification of a secondary headache, "does not render it irrelevant; rather, the ALJ 'must consider and discuss the limiting effects of all impairments and any related Symptoms when assessing a person's RFC.'" *Gutierrez v. Kijakazi*, 2023 WL 2614456 (D.N.M. Mar. 23, 2024) (citing Soc. Sec. Rul. 19-4p, 2019 WL 4169635, at *7). Nonetheless, the ALJ proceeded to discuss and consider whether Claimant's headaches produced any limitations on claimant's ability to work. The ALJ

noted that Claimant had "not received any specialized diagnostic or therapeutic care for his headaches that might establish a cause for them . . . [and a]lthough he has a history of being prescribed pain care medications, they are not prescribed to manage his headaches." (Tr. 533). The ALJ's analysis also indicated that Claimant's medical records show "scant treatment for headaches," and that he denied having headaches at his consultative exams and on several other occasions throughout the record, even though he had been prescribed medication for his headaches on at least one occasion. (Tr. 530). The ALJ also summarized Claimant's testimony pertaining to his headaches from the third administrative hearing in which Claimant testified that he had headaches once a month that lasted 2-3 days, that his neck pain was a trigger for his headaches, and that no one had prescribed him medications for his headaches. (Tr. 532).

As to claimant's cervical disk disease, the ALJ noted with respect to Claimant's spinal pain, his medical treatment "was quite conservative in nature" and that Claimant's pain was treated with mild prescription medications, he never visited a hospital or urgent care for his pain or underwent any surgeries or emergency care, and that his claims of pain were largely uncorroborated by objective medical evidence. (Tr. 533). Due to this, the ALJ concluded Claimant's pain did not preclude work activities because Claimant "reasonably would have been expected to require more intensive and more frequent palliative treatment.") *Id.* The Court finds that the ALJ set out the appropriate analysis and cited substantial evidence supporting his reasons for finding that Claimant's subjective complaints cannot be expected to produce the symptoms to the degree alleged by Claimant.

## II.     State Agency Assessments

Claimant also contends that the ALJ erred by failing to articulate the weight he provided to the state agency psychologists' assessments. "Social Security Ruling 96-6p instructs that the ALJ 'must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians and psychologists.'" *Santillana-Wolf v. Saul*, 2020 WL 6580618, at *3 (E.D. Okla. Nov. 10, 2020) (quoting 1996 WL 374180, at *4 (July 2, 1996)).[6]

Here, the record is clear that the ALJ provided some weight to the state agency medical consultants' assessments even though he did not assign a specific weight to the state agency psychologists' opinions. (Tr. 533). However, in this instance any error is harmless because Claimant does not effectively identify any diagnosis or limitations found by Dr. Pearce and Dr. Gunter that the ALJ did not adopt. Claimant points to Dr. Gunter's RFC findings noting that he concluded Claimant is capable of simple tasks with routine supervision, relating to supervisors and peers on a superficial work basis, unable to relate to the general public, and able to adapt to a work setting and some forewarned changes in a usually stable work setting. Similarly, the ALJ's found Claimant "can understand, remember, and carry out simple instructions, is able to use appropriate judgment to make simple work related decisions, can maintain attention and concentration to perform simple repetitive tasks, can work in proximity with co-workers and supervisors provided they do not have to work in collaboration to complete work tasks, and can tolerate a low level of

---

[6] Soc. Sec. Rul. 96-6p was rescinded and superseded by Soc. Sec. Rul. 17-2p for claims filed on or after March 27, 2017. Because Claimant filed his application in 2014, Soc. Sec. Rul. 86-6p applies in this matter.

work pressure defined as work that does not require multitasking, significant independent judgment, or contact with the public." (Tr. 529). As even Claimant notes, "despite not acknowledging [Dr. Gunter's] opinion, the ALJ appeared to adopt all [of Dr. Gunter's] limitations." Accordingly, although the ALJ erred by failing to assign a weight to Dr. Pearce's or Dr. Gunter's psychological assessments, such error is harmless. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1163 (10th Cir. 2012) (concluding ALJ's failure to assign a specific weight to a consulting examiner's opinion was harmless where the opinion was generally consistent with the ALJ's residual functional capacity findings).

### III.    Claimant's Education and Literacy

Next, Claimant asserts that the ALJ erred by implicitly concluding he was literate and by failing to discuss his own Function Reports, the Third-Party Function Reports completed by his mother, and the subjective statements of Claimant and his mother that Claimant is illiterate and unable to read. In response, the Commissioner contends that there is sufficient evidence demonstrating that Claimant is literate, and that the VE's testimony does not conflict with the DOT. The Court agrees with the Commissioner.

Although a tenth-grade level of formal education is generally classified as limited education, such classification can be modified where there is evidence that Claimant's educational abilities contradict the completed grade level. *See* 20 C.F.R. §§ 404.1564(b), 416.964(b). However, "[u]se of a numerical grade level to determine educational abilities is only appropriate 'if there is no other evidence to contradict it.'" *Dollar v. Bowen*, 821 F.2d 530, 535 (10th Cir. 1987) (quoting 20 C.F.R. (quoting 20 C.F.R. § 416.964(b)(3)). Claimant argues that he is illiterate and should not be credited as having a limited

education. "Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." 20 C.F.R. §§ 404.1564(b)(1) and 416.964(b)(1). In support of his illiteracy claim, Claimant references his generally poor academic performance, the Function Reports completed by him and his mother asserting he is illiterate and cannot read, and his own hearing testimony.

The ALJ's written decision does not discuss any of the above evidence and concludes that Claimant has a limited education. Nonetheless, the evidence pertaining to claimant's illiteracy is not substantially probative. Here, the record reflects that Claimant completed tenth grade without the assistance of special education (Tr. 33, 403), and that he could read "some" and write, albeit, with misspelled words. (Tr. 403). In fact, Claimant testified that he enjoyed reading "hot rod magazines." (Tr. 403). Additionally, his educational records indicate that, despite generally receiving low grades throughout formal education, he was assessed with a 5th grade reading level, and received C's and D's in his writing courses in early education. (Tr. 249-252). Claimant also completed a Function Report in which he was able to generally read and respond to questions in a written manner, without any declared assistance (Tr. 202-209), and his Third-Party Application indicated that Claimant could speak, read, and write in English. (Tr. 157). The only evidence in the record indicating that Claimant was illiterate are the subjective statements presented in the Third-Party Function Reports completed by Claimant's mother, and one Function Report completed by Claimant with the assistance of his mother (despite completing another

Function Report on his own).  (Tr. 193, 255, 263). There is therefore insufficient evidence in the record demonstrating that Claimant cannot read or write a simple message. Accordingly, there is substantial evidence to support the ALJ's implicit determination that Claimant is literate, and the ALJ did not err by failing to discuss the educational records and Function Reports in determining his education level. *Clifton*, 79 F.3d at 1009-10 ("an ALJ is not required to discuss every piece of evidence . . . [but] "must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."); *Scott v. Berryhill*, 271 F. Supp. 1235, 1239-40 (N.D. Okla. Sept. 14, 2017) (noting that ALJ's failure to discuss claimant's testimony about her inability to read was not reversible error because the "evidence of literacy [was] not substantially probative" and "the ALJ's failure to discuss it was harmless given that discussion of it would not change the outcome of the case on remand."); *Beaver v. Colvin*, 2016 WL 5408157, at *5 (E.D. Okla. Sept. 28, 2016) (rejecting claimant's argument of illiteracy based on claimant's subjective statements because claimant's testimony and documents in the record indicated he was literate).

## IV.    Testimony Elicited from the Vocational Expert

In conjunction with Claimant's assertion that he is illiterate, Claimant asserts the ALJ's RFC determination limiting him to simple, repetitive tasks conflicts with the jobs identified by the VE because they require reasoning level two and that this represents a conflict the ALJ failed to resolve. Under Social Security Ruling 00-4p, "[w]hen vocational evidence provided by a VE or VS is not consistent with information in the DOT, the [ALJ] must resolve this conflict before relying on the VE or VS evidence to support a

determination or decisions that the individual is not disabled. The [ALJ] will explain in the determination or decision how he or she resolved the conflict. The [ALJ] must explain the resolution of the conflict irrespective of how the conflict was identified." 2000 WL 1898704, at *4 (Dec. 4, 2000). Here, although the VE did not identify any conflict between his/her testimony and the DOT, Claimant contends that there is a conflict regarding the reasoning and language levels of the jobs identified.

Here, the VE identified the jobs of photocopy machine operator (DICOT § 207.685-014), laundry classifier (DICOT § 361.687-014), and garment sorter (DICOT § 222.687-014). (Tr. 443). All of these jobs have a reasoning level of 2 which is defined as the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and] deal with problems involving a few concrete variables in or from standardized situation." DICOT §§ 207.685-014, 361.685-014, 222.687-014.

The Tenth Circuit instructs that jobs with a reasoning level of 3 are inconsistent with an RFC limiting a claimant to "simple and routine work tasks." *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005). In contrast, "level-two reasoning appears more consistent" with such an RFC. *Id.*; *Stokes v. Astrue*, 274 Fed. Appx. 675, 684 (10th Cir. 2008) (rejecting the argument that "simple, repetitive and routine work" should be construed as a limitation to jobs with a reasoning level of one). This Court and others have routinely determined that level-two reasoning is consistent with simple tasks. *See*, *e.g.*, *Couch v. Berryhill*, 2017 WL 1194344, at *4 (E.D. Okla. Mar. 12, 2017) (finding "simple work" consistent with a reasoning level of two.). Accordingly, the Court finds no error as to the reasoning level of the jobs identified.

Claimant also asserts that there is a conflict between the assigned jobs and his reading and writing capabilities. The jobs of photocopy machine operator and garment sorter are identified as having language levels of one, which requires an individual to "[r]ecognize meaning of 2,500 (two-or three-syllable) words. Read at a rate 95-120 words per minute. [And, c]ompare similarities and differences between words and between series of numbers." With respect to writing, a language level of one requires only the ability to write simple sentences. DICOT §§ 207.685-014, 222.687-014. A language level of one is the lowest level. *See* DICOT, App. C, Sec. II (4th ed., revised 1991), 1991 WL 688702. The job of laundry classifier requires a language level of 2, which requires an individual to read 5,000 to 6,000 words, read approximately 195-215 words per minute, while being able to read adventure and comic books, and look up unfamiliar words in the dictionary to determine a word's meaning, spelling, and pronunciation. DICOT § 361.687-014. Here, although there appears to be a conflict between Claimant's reading and writing capabilities and the language level 2 requirement for the job of laundry classifier, there is substantial evidence in the record demonstrating that Claimant is not illiterate (as discussed above) and that he is capable of performing the representative jobs of photocopy machine operator and garment sorter. "Most importantly, though, the claimant disregards that he has the burden to provide evidence of his functional limitations. The Commissioner's burden at step five is to prove that there are jobs in the economy the claimant can perform given the limitations proven at steps one through four, it is not to provide medical evidence in support of an RFC assessment, unless the ALJ's duty to further develop the record is triggered." *Beaver*, 2016 WL 5408157, at *6 (internal citations omitted). As the vocational expert

identified two representative jobs which did not conflict with Claimant's RFC, the ALJ was entitled to rely upon the vocational expert's testimony at step five and no error is found on this basis. *Couch*, 2017 WL 1194344 at *4 (finding no error where the vocational expert identified two representative jobs which accommodated Claimant's RFC).

## Conclusion

In summary, the Court finds that the decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. Accordingly, the decision of the Commissioner of the Social Security Administration is AFFIRMED.

**DATED** this 10th day of January 2024.

_____
**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**